IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                        *Plaintiff*,<br><br>    v.<br><br>MICHAEL ALLEN BARNES,<br><br>                        *Defendant*. | Criminal No. 2:24-cr-125 - 1<br><br>Hon. William S. Stickman IV |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

On June 4, 2024, Michael Allen Barnes ("Barnes") was charged by indictment with possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 10). It is alleged that on or about April 11, 2024, knowing that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, Barnes possessed a Smith & Wesson .380 caliber pistol bearing serial number NFH5096 and various rounds of Sig Sauer 9mm caliber ammunition. (*Id*. at 1). The qualifying prior conviction was identified as "Burglary, on or about March 20, 2017, at Docket Number 17-B-0408-6, in the Superior Court of Gwinnett County, Georgia." (*Id*.). Barnes filed his Motion to Dismiss the indictment against him arguing that § 922(g)(1) is unconstitutional, as applied, under the Second Amendment of the United States Constitution. (ECF No. 34). For the following reasons, the Court will deny Barnes's motion.

        **I.**        **STANDARD OF REVIEW**

The Federal Rules of Criminal Procedure require that an indictment be a plain, concise, and definite written statement of the essential facts constituting the offense charged. FED. R.

1

CRIM. P. 7(c)(1). An indictment is sufficient if it includes the elements of the offense intended to be charged, apprises the defendant of what he must be prepared to defend against at trial, and enables him to plead a former acquittal or conviction in the event of a subsequent prosecution. *United States v. Rawlins*, 606 F.3d 73, 78-79 (3d Cir. 2010); *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). An indictment that fails to charge all elements of a crime must be dismissed. *United States v. Cochran*, 17 F.3d 56, 57 (3d Cir. 1994).

A motion to dismiss an indictment is governed by Federal Rule of Criminal Procedure 12 ("Rule 12"), which states: "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1).

> [T]he scope of a district court's review at the Rule 12 stage is limited. "[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (internal citations omitted). "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *Id.* at 661. There is no criminal corollary to the civil summary judgment mechanism. *Id.* In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment. *United States v. Sampson*, 371 U.S. 75, 78–79 (1962); *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). "Evidentiary questions—such as credibility determinations and the weighing of proof—should not be determined at this stage." *Bergrin*, 650 F.3d at 265 (internal quotation marks and citation omitted). Thus, a district court's review of the facts set forth in the indictment is limited to determining whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged. *Panarella*, 277 F.3d at 685; *DeLaurentis*, 230 F.3d at 660.

*United States v. Huet*, 665 F.3d 588, 595-96 (3d Cir. 2012), *abrogated on other grounds*. Under Rule 12, the Court can dismiss criminal charges in an indictment where there is an infirmity of law in the prosecution, such as an unconstitutional statute.

## II.    ANALYSIS

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.    In 2008, the Supreme Court of the United States held that, "on the basis of both text and history," the Second Amendment protects *an individual's* right to keep and bear arms.  *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (emphasis in original).  The Supreme Court made clear, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."  *Id*. at 626.  Relevant to the instant motion, the Supreme Court stated:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 625-27.  It further noted that "these presumptively lawful regulatory measures" were only examples and not an exhaustive list.  *Id*. at 627, n.26.  "[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."  *Id*. at 635.

In June 2010, the Supreme Court held that the Second Amendment right, elucidated in *Heller*, is incorporated against the states.  *See McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).  More specifically, it held that "the right to keep and bear arms for the purpose of self-defense" in the home recognized by the Second Amendment "is fully applicable to the states."  *Id*.  The Supreme Court reiterated its observations in *Heller* that the right protected by the Second Amendment (like the rights protected elsewhere in the Constitution) is not unlimited and stated plainly: "We made it clear in *Heller* that our holding did not cast doubt on such

longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here." *McDonald*, 561 U.S. at 786 (quoting *Heller*, 544 U.S. at 626-27). "[I]ncorporation does not imperil every law regulating firearms." *Id*.

Prior to 2022, courts within the United States Court of Appeals for the Third Circuit applied a "means-end scrutiny" analysis in Second Amendment cases. *See Lara v. Comm'r of Pennsylvania State Police*, 125 F.4th 428, 433 n.9 (3d Cir. 2025) (citing cases). In 2022, the Supreme Court articulated an approach to addressing challenges invoking the Second Amendment in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). It rejected the kinds of tests developed by the appellate courts which employed a "means-end" scrutiny. *Id*. at 17-20. In their place, the Supreme Court articulated a new test:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Id*. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). *Bruen* does not explicitly address the propriety of firearm possession bans for persons previously convicted of a felony crime; however, it refers to those falling under the protection of the Second Amendment as "law-abiding" people. Thus, *Bruen* does not upset the Supreme Court's consistent endorsement of felon disarmament. The Supreme Court explicitly stated that it is "[i]n keeping with *Heller*." *Id*.

Then, in *United States v. Rahimi*, 602 U.S. 680, 692 (2024), the Supreme Court clarified that "the appropriate analysis" under *Bruen*'s second step "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." Thus, challenged regulations are evaluated at a higher level of generality than whether "those regulations [are] identical to ones that could be found in 1791." *Id*. Rather than seeking out a perfect statutory analogue, "dead ringer," or "historical twin," courts must draw on "relevantly similar" historical regulations to derive "principles underlying the Second Amendment" and then ask if the modern-day regulation "comport[s] with th[ose] principles" in terms of "why and how it burdens the Second Amendment right." *Id*. Ultimately, the Supreme Court affirmed the denial of a motion to dismiss a defendant's indictment holding, "[w]hen a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may–consistent with the Second Amendment–be banned from possessing firearms while the order is in effect." *Id*. at 690.

Following the *Rahimi* decision, the Third Circuit directly applied *Bruen* in *Range v. Attorney Gen. United States of Am.*, 124 F.4th 218 (3d Cir. 2024) ("*Range II*"). The Third Circuit evaluated an as-applied challenge under *Bruen* to the prohibition of felons possessing firearms in § 922(g)(1). Range pleaded guilty in 1995 to making a false statement to obtain food stamps. At the time he pleaded guilty, his conviction was considered a misdemeanor punishable by up to five years' imprisonment. His conviction precluded him from possessing a firearm under § 922(g)(1). *Id*. at 223. To reemphasize – Range was not a felon; he committed a nonviolent misdemeanor offense relating to false statements on an application for public benefits. Range wanted to possess a hunting rifle and shotgun for home defense so he sought a declaration that § 922(g)(1) violates the Second Amendment as applied to him.

The Third Circuit applied the *Bruen* analysis and ruled in Range's favor. After determining that Range was one of "the people" to whom the Second Amendment applies, and his proposed conduct (owning a hunting rifle) was protected by the Second Amendment, the Third Circuit then asked whether the Government carried its burden to justify stripping Range of that right. *Id*. at 226-28. In order to justify § 922(g)(1) as it applied to Range, the Government needed to show that the statute was "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 228 (quoting *Bruen*, 597 U.S. at 24). The Third Circuit determined that the Government had not met its burden because a review of sources from the founding era and early Republic do not reveal that the disarmament of people like Range was practiced or contemplated. Rather, a review of those sources demonstrated that at the time of the ratification of the Second Amendment, disarmament was limited to individuals who were viewed as dangerous to the community. *Id*. at 229-31. In other words, the Third Circuit held that the Government failed to show that the historical tradition of firearms regulation would have deprived Range of his Second Amendment right to possess a firearm in light of his conviction for making false statements on an application for public benefits.

Then, the Third Circuit in *Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025) summarized all of the above law as follows:

> The upshot of these cases is threefold: First, as *Bruen* and *Rahimi* make clear, our inquiry into principles that underlie our regulatory tradition does not reduce historical analogizing to an exercise in matching elements of modern laws to those of their historical predecessors. Instead, we must consider whether the principles embodied in different strands of historical firearm regulations, "[t]aken together," *Rahimi*, 602 U.S. at 698, 144 S.Ct. 1889, support contemporary restrictions, all the while remaining vigilant "not to read a principle at such a high level of generality that it waters down the right," *id*. at 740, 144 S.Ct. 1889 (Barrett, J., concurring).
>
> Second, whatever other recourse may or may not be available, felons seeking to challenge the application of § 922(g)(1) at least may bring declaratory judgment

6

actions. But to grant such relief, the record must be sufficient for a court to make an individualized determination that the applicant does not presently pose the kind of danger envisioned by *Rahimi* and *Range II*. In keeping with *Heller's* conclusion that "the Second Amendment confers an individual right to keep and bear arms," 554 U.S. at 622, 128 S.Ct. 2783, that determination necessarily demands individualized fact-finding.

Third, while *Rahimi* and *Range II* did not purport to comprehensively define the metes and bounds of justifiable burdens on the Second Amendment right, they do, at a minimum, show that disarmament is justified as long as a felon continues to "present a special danger of misus[ing firearms]," *Rahimi*, 602 U.S. at 698, 144 S.Ct. 1889, in other words, when he would likely "pose[ ] a physical danger to others" if armed, *Range II*, 124 F.4th at 232. Indeed, as Judge Bibas presciently observed even before *Bruen*, "[a]s an original matter, the Second Amendment's touchstone is dangerousness," *Folajtar v. Att'y Gen.*, 980 F.3d 897, 924 (3d Cir. 2020) (Bibas, J., dissenting); *see also Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("[L]egislatures have the power to prohibit dangerous people from possessing guns."), and our sister circuits have articulated the principle similarly in light of *Rahimi*, *see United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (per curiam) ("The historical record demonstrates 'that legislatures have the power to prohibit dangerous people from possessing guns.'" (quoting *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting))); *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024) ("[O]ur nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous."); *United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed.").

*Id*. at 210-11.

For the following reasons, the Court holds that Barnes's "as applied" challenge fails. The threshold question is whether Barnes is one of "the people" protected by the Second Amendment despite having a prior felony conviction. The Government concedes that Barnes is protected. The Court holds that as an adult American, Barnes is among the people presumptively protected by the Second Amendment. *See Lara*, 125 F.4th at 438-39 (holding that all adult Americans are presumptively among "the people" to whom Second Amendment rights extend); *see also United States v. Moore*, 111 F.4th 266, 269 (3d Cir. 2024) ("As an adult citizen, Moore is one of the 'people' whom the Second Amendment presumptively protects."); *Range II*, 124 F.4th 218

7

(rejecting the argument that "the people" includes only law-abiding citizens); *Heller*, 554 U.S. at 580-81 (explaining that "'the people' as used throughout the Constitution unambiguously refers to all members of the political community, not an unspecified subset").

Having determined that Barnes is one of "the people," the next questions are whether "'the Second Amendment's plain text covers [Barnes's] conduct,' and 'the Constitution presumptively protects that conduct.'" *Bruen*, 597 U.S. at 17-19. The Third Circuit in *Pitsilides* directed:

> Courts adjudicating as-applied challenges to § 922(g)(1) must consider a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction, to evaluate whether he meets the threshold for continued disarmament. As *Range II* illustrated, consideration of intervening conduct plays a crucial role in determining whether application of § 922(g)(1) is constitutional under the Second Amendment. *See* 124 F.4th at 232. Indeed, such conduct may be highly probative of whether an individual likely poses an increased risk of "physical danger to others" if armed. *Id.*

*Pitsilides*, 128 F.4th at 212. Consequently, the Court will consider Barnes's alleged criminal conduct and his criminal history.[1]

The Government has represented that it is prepared to show the following facts:

On April 11, 2024, members of the United States Marshals Service Western Pennsylvania Fugitive Task Force ("USMS WPAFTF") arrested defendant after receiving a referral from the USMS Southeast Regional Fugitive Task Force in Northern Georgia. Defendant was wanted on two Union City, Georgia felony arrest warrants for charges of Aggravated Child Molestation and Aggravated Sodomy.[ ] During a search incident to his arrest, defendant admitted to having a firearm in his waistband. Law enforcement recovered the firearm from defendant's waistband. The firearm—a black Smith & Wesson .380 handgun loaded with eight rounds of ammunition in the magazine and one round in the chamber—was secured tightly against defendant's person with his belt, pinning the firearm to his waist. In addition to the above-described firearm, law enforcement also recovered two containers of marijuana, a digital scale, an

---

[1] The Court is able to make factual determinations regarding Barnes's indicted criminal conduct (recognizing the presumption of innocence) and his criminal history without an evidentiary hearing as he does not dispute the Government's summaries. (ECF No. 37).

expired Georgia license, and a Georgia driver's license in the name of another individual, from defendant.

(ECF No. 36, pp. 1-2) (footnote omitted). Barnes has not argued that he possessed the gun for self-defense purposes. It would be difficult for him to advance such an argument as he is classified as a person prohibited from possessing a firearm by virtue of his criminal history.

The Government provided the following summary of Barnes's prior felonious conduct underlying the instant charge:

> On October 5, 2016, defendant unlawfully entered the personal residence of a Norcross, Georgia resident with an intent to commit a theft within her home. After breaking into the residence, the defendant stole a flat-screen television. On March 20, 2017, defendant pled guilty to one felony count of first-degree burglary in the Superior Court of Gwinnett County, Georgia, a violation of O.C.G.A. § 16-7-1(b); he was sentenced to serve five years' probation.

(ECF No. 36, p. 2). The Government described the underlying facts as follows:

> Fortunately, the apartment was unoccupied at the time of the burglary, which occurred in the middle of the afternoon at approximately 2 o'clock, and in broad daylight. A female teenage resident of the apartment complex reported defendant's suspicious activity to police. This minor witness observed defendant striking the back door of her neighbor's apartment to force entry, and ultimately saw the defendant enter the apartment. Upon arriving to the scene, law enforcement noted the damage to the apartment's front door where defendant repeatedly struck it to force entry.

(*Id*. at 9). The Government argues that "Defendant's burglary posed a risk of violence to the resident of the apartment, and to others who lived within the apartment complex, including the teenage resident who reported the burglary to authorities." (*Id*. at 10).

Barnes's criminal history also includes:

> [A] June 6, 2012 Disorderly Conduct conviction (resulting in a sentence of 12 months' probation) and a November 2, 2007 conviction for Battery/Simple Battery—Family Violence and Criminal Trespass in violation of O.C.G.A. §§ 16-5-23 and 16-7-21 (case no. 07SR10986; also resulting in a sentence of 12 months' probation)." (*Id*.). On May 7, 2007, defendant admitted to the battery of his pregnant paramour (by striking her about the head or body), and the unlawful and intentional destruction of her cell phone

9

(*Id*. at 2). The Government points out that Barnes was convicted of a crime "directly involving physical violence" against his pregnant intimate partner, although it was not graded as a felony under Georgia law. (*Id*. at 10). The Government has represented that after Barnes's conviction for battery, he violated the terms of his probation by having contact with the victim over the internet. As a result of this conduct, he was sentenced to six months' imprisonment. Under the terms of his new "Domestic Violence Supplemental Sentence," Barnes was prohibited from owning, receiving, transporting, or possessing a firearm or any type of ammunition. (*Id*. at 10).

Barnes's criminal history demonstrates that he has engaged in conduct reasonably likely to cause (1) danger to life and limb and (2) general mayhem. Further, it indicates that he has a general propensity for violence. "[T]hough residential burglary and drug dealing are not necessarily violent, they are dangerous because they often lead to violence." *Folajtar v. Attorney General of the United States*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting); *see also United States v. Williams*, 113 F.4th 637, 659 (3d Cir. 2024) (observing that legislatures may disarm those convicted of drug dealing or burglary because, while "[t]hese crimes do not always involve an immediate and direct threat of violence," they "may nonetheless pose a significant threat of danger," warranting disarmament). Furthermore, the Court agrees with its colleague, the Honorable Cathy Bissoon, that:

> Notions of morality and decency aside, violence against children and family members - often the most vulnerable populations - offends the law. It does now, and it has through the centuries. *See U.S. v. Jackson*, 138 F.4th 1244, 1254 (10th Cir. 2025) (holding same regarding "judicial determinations [that the defendant] engaged in violence against a family member or an intimate partner") (citation and original quotations omitted); *U.S. v. Gailes*, 118 F.4th 822, 827 (6th Cir. 2024) ("Domestic-violence convictions generally involve some sort of physical force," and, "[w]hen the presence of a gun accompanies the use of physical force, the likelihood that abuse turns to homicide greatly increases.") (citations omitted); *U.S. v. Watson*, 2025 WL 833246, *2 (6th Cir. Mar. 17, 2025) (the defendant's domestic violence conviction under Ohio law meant that he "caused or attempted

10

> to cause physical harm, or recklessly caused serious physical harm, to a family or household member," thus supporting a finding of dangerousness under § 922(g)(1), as applied); *U.S. v. Vecera*, 2025 WL 758808, *7 (W.D. Tex. Feb. 17, 2025) (disarmament was constitutional because the defendant pleaded guilty to a Texas criminal statute prohibiting the violation of a bond condition "designed to protect vulnerable family members").

*United States v. Paul Lyn Graves*, Criminal No. 22-247, 2025 WL 1784933, **4-5 (W.D. Pa. June 29, 2025). Barnes's past crimes did (or could have) put another's safety at risk, therefore, a finding of danger is justified. The Court holds that Barnes poses a danger of misusing firearms in a way that would endanger others.

Section 922(g)(1)'s ban on firearm possession by persons like Barnes is consistent with our country's historic tradition of regulating firearms. While, as *Range* observed, there is no historical tradition from the colonial era or early Republic categorically disarming those merely convicted of crimes (particularly, crimes relating to the sort of conduct that Range committed), there is a long history of disarming people who pose a danger to society. As early as the seventh century, English law permitted the disarmament of violent and dangerous people. Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 258 (2020) (citing *Ancient Laws and Institutes of England* 3 (Benjamin Thorpe ed., 1840) (describing the Laws of King Aethelbirht as banning the provision of arms to another "where there is strife"). A millennium later, in the seventeenth century, King Charles II ordered the Lord Mayor of London to disarm "dangerous and disaffected persons." *Id.* at 259 (citing 10 *Calendar of State Papers, Domestic Series, Domestic Series of the Reign of Charles II, 1660-1670* 237 (1895)). This included Catholics who, following the failed gunpowder plot, were viewed as disloyal and potentially dangerous. *Id.* at 258 (citing 1 *Stuart Royal Proclamations: Royal Proclamations of King James I 1603-1625*, 247-48 (June 2, 1610) (James F. Larkin & Paul I. Hughes eds., 1973)).

11

Colonial laws mirrored English models and similarly disarmed those persons viewed as a danger to public order, including Native Americans, Catholics, Quakers, enslaved persons, and freed Black people. Such laws imposing discriminatory class-wide disarmament would undisputedly fail both moral and constitutional scrutiny under modern standards. Nevertheless, they demonstrate that at the time of the founding, the American colonists were accustomed to laws depriving persons who they perceived as posing a special threat to society from possessing firearms. Colonial laws also disarmed those whose actions made them a danger to the community. Laws passed in Massachusetts and New Hampshire forbade the carrying of arms "in an aggressive and terrifying manner." *Id.* at 262. Likewise, Virginia allowed the disarmament of those "who ride, or go, offensively armed, in Terror of the People." *Id.* at 262 (citing George Webb, *The Office of Authority of a Justice of the Peace* 92-93 (1736)).

At the time of the ratification of the Second Amendment, the framers and the people understood that the right to keep and bear arms extended to all "peaceable" citizens. Greenlee, *The Historical Justification*, 20 WYO. L. REV. at 266 (citing 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 675 (1971)); *see also* Stephen Halbrook, THAT EVERY MAN BE ARMED 86 (revised ed. 2013) ("[T]he Second Amendment…originated in part from Samuel Adams's proposal . . . that Congress could not disarm any peaceable citizens."). Samuel Johnson's dictionary from the time of ratification defined "peaceable" as "1. Free from war; free from tumult; 2. Quiet; undisturbed; 3. Not violent; not bloody; 4. Not quarrelsome; not turbulent." 2 Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773).[2] The prevailing view that "peaceable" citizens were secure in their right to keep and bear arms

---

[2] Johnson's dictionary is an authoritative resource for the meaning of words as understood by the founding generation. The Supreme Court cited to it in *Heller* to interpret the language of the Second Amendment. *See Heller*, 554 U.S. at 582-84.

excluded those who did not fall within that definition—those who were, conversely, dangerous. As Third Circuit Judge Thomas M. Hardiman's concurring opinion in *Binderup v. Att'y Gen. United States of America*, 836 F.3d 336, 368 (3d Cir. 2016) observed:

> [T]he debates from the Pennsylvania, Massachusetts and New Hampshire ratifying conventions, which were considered "highly influential" by the Supreme Court in *Heller*…confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses. Hence the best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public.

(internal citations omitted).

The disarming of people who pose a danger to society is deeply rooted in our country's legal traditions. "The right to keep and bear arms always has been subject to careful limitations," which "are at their zenith when applied to people who are the antithesis of the law-abiding citizen who wants to exercise his or her right to self-defense, whether at home or in public, and who may also enjoy the various sports and other activities that involve guns." *Atkinson v. Garland*, 70 F.4th 1018, 1037 (7th Cir. 2023) (Wood, J., dissenting). Holding § 922(g)(1) unconstitutional as applied to a defendant like Barnes would strip Congress of its ability to protect the public from a clear and present danger. That is not something that the Court is willing to condone. Barnes's background shows that in stark contrast to Range, he poses a danger to society. It is consistent with the Supreme Court's observation in *Heller* and its progeny, as well as historical tradition, to deprive him of his right to possess a firearm. The prohibition on firearm possession by felons under § 922(g)(1) does not violate the Second Amendment, particularly as applied to Barnes.

## III. CONCLUSION

For the foregoing reasons, Barnes's motion will be denied. An Order of Court will follow.

BY THE COURT:

s/ William S. Stickman IV
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

August 13, 2025
Date